UNITED STATES DISTRICT COURT　　　　FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GAETAN REMY,

               Petitioner,　　　　　　　　MEMORANDUM
　　　　　　　　　　　　　　　　　　　　　　AND ORDER

   -against-　　　　　　　　　　　　　　06 CV 3637 (JG)

HAROLD GRAHAM, Superintendent,
Auburn Correctional Facility,

               Respondent.
-----------------------------------------------------------X

A P P E A R A N C E S :

    APPELLATE ADVOCATES
        2 Rector Street
        10th Floor
        New York, NY 10006
    By:   Lynn W. L. Fahey
        Attorneys for Petitioner

    RICHARD A. BROWN
        Queens County District Attorney
        125-01 Queens Boulevard
        Kew Gardens, NY 11415
    By:   Emil Bricker
        Attorney for Respondent

JOHN GLEESON, United States District Judge:

        Gaetan Remy, a state prisoner, petitions for a writ of habeas corpus challenging his conviction by a Queens jury of, among other crimes, multiple counts of intentional assault. Remy was sentenced to 25 years in prison. For the reasons discussed below, the petition is denied.

BACKGROUND

A.  *The Offense Conduct and Subsequent Mental Health Analyses*

On July 6, 2002, Remy was arrested on a misdemeanor assault charge after an altercation with a woman he was living with. After a recommendation by a doctor that he be transferred to the general population at Rikers Island, Remy pled guilty to attempted assault in the third degree and was sentenced to time served and probation. On August 29, 2002, the Probation Department charged Remy with violating probation because he refused to sign certain documents at an intake interview without an attorney present.

The events giving rise to the conviction challenged by this petition took place at the hearing on that charge on October 10, 2002. Remy became agitated and disruptive in court. The judge ordered that he be remanded. A female court officer cuffed one of Remy's arms, at which point he began flailing his arms and knocked her backward. Two other court officers and the court clerk then attempted to subdue Remy while he resisted. One officer struck Remy with a baton. In the struggle, two officers were injured and the group overturned and smashed a table in the courtroom. Another officer then grabbed Remy around the waist to execute a takedown and struggled with him briefly until Remy bit off the officer's earlobe using a removable metal dental bridge. Eventually, Remy was subdued.

Remy was arrested for this conduct. His mental health intake screening diagnosed him as suffering from post-traumatic stress disorder ("PTSD"). The report of that screening noted that Remy reported being beaten and sexually abused by gang members while in prison previously. Remy also reported that he bit the officer in court because he had suffered "flashbacks" of the prison assault incident. Petition Ex. H (Intake Screening Form 3, Oct. 15,

2002). Subsequent mental health evaluations before the grand jury proceedings also reflected Remy's reports of the prison assault and presented a similar diagnosis.

Documents attached to Remy's petition indicate that Remy had reported the prison assault before the October 10, 2002 incident. On June 5, 1999, while he was incarcerated at Riker's Island, Remy wrote a notarized letter to two attorneys stating that he had been "assaulted physic[a]lly and sexually" and he complained of injuries and emotional disturbance as a result. Petition Ex. G (Letter of Gaetan Remy, June 5, 1999). In the letter, Remy also stated that he initially reported the incident truthfully, but that after his return from the hospital, corrections officers forced him to provide a false account in return for removal to a safer part of the prison. In addition, the notes of a mental health social worker who examined Remy shortly after his July 6, 2002 arrest state, "Mr. Remy reported that he was attacked by a gang who tried to rape him in 3U2 building C-73 -- 2 ½ years ago. Since his arrest he has been having flash backs [sic], nightmares and hypervigilance. He is scared of going to Riker's Island." Petition Ex. H (Physicians' Clinic Notes).

B.  *The Grand Jury Proceedings and Subsequent Mental Health Analyses*

On November 7, 2002, Remy, accompanied by his attorney, testified before a grand jury. He spoke about the prison assault, and stated that after he was remanded, several court officers had "jump[ed]" on him, he had suffered a flashback to the assault, reacted out of "temporary insanity," and "didn't know what [he] was doing." Grand Jury Tr. 47. He said he had later been told that he had bitten off an officer's ear during the incident. In response to the prosecutor's questions, Remy demonstrated and critiqued[1] certain submission holds and

---

[1] Remy has claimed to be a martial-arts student and instructor. *See* Petition Ex. B (Examination of Dr. Weidenbacher) 1.

grappling techniques he claimed were used in the altercation. He also stated that he had pled guilty to the underlying attempted assault charge because his fear of being in jail was so extreme and he had been offered a sentence of time served and probation.

Remy was indicted on a number of counts of intentional assault and other crimes relating to the courtroom incident. On December 3, 2002, the court ordered an examination to determine Remy's competency to stand trial. Two doctors, Richard L. Weidenbacher, a psychiatrist, and Robin Kerner, a psychologist, examined Remy and found him fit to proceed. Both also diagnosed him as suffering from chronic PTSD. Remy reported to Weidenbacher that he had been physically assaulted by a gang while in prison, but did not report any claims of sexual abuse. Weidenbacher noted that certain missing teeth corroborated Remy's report. He concluded that Remy "may well have suffered from post-traumatic stress disorder as a result of having been assaulted in 1999, but probably also as a result of 3 automobile accidents" Remy had been involved in. Petition Ex. B (Examination of Dr. Weidenbacher) 2. In addition to PTSD, Weidenbacher opined that Remy's "family history might also have been a factor" contributing to his fear of prison. *Id.* at 3. The psychiatrist concluded that "[i]t may well be . . . that [Remy] was in fact beset by extraordinary or irrational[] apprehensi[on] or fear and that such fear was an important factor in his reaction on court officers who converged on him." *Id.* at 2. Dr. Kerner's report agreed with the findings of Dr. Weidenbacher.

Remy's attorney received copies of the Kerner and Weidenbacher examinations. The attorney then wrote to Weidenbacher, telling him he was considering calling the two doctors as defense witnesses to testify about PTSD and its relationship to the offense conduct, and asking to speak to Weidenbacher before trial. In a postscript, he asked Weidenbacher whether he had

4

based his discussion of the prison assault on "prison records" or only "the defendant's word." Petition Ex. D (Letter of Martin Goldberg, Mar. 5, 2003) 2. Weidenbacher responded with his availability, and stated that he had seen no records other than the accusatory instrument.

C. *The* Sandoval *Hearing*

At a pretrial hearing, the prosecutor moved to preclude Remy from presenting psychiatric testimony at trial because his attorney had not provided notice of such testimony. Remy's attorney objected that the prosecutor was already on notice of the possibility of such evidence from Remy's grand jury testimony. He stated, though, that he did not want to commit himself to a particular defense because of "the nature of [his] relationship" with Remy. H'g Tr. 10-11. When pressed by the court, however, Remy's attorney stated he would call the psychiatrist to testify, on the theory that the prison assault had "impacted on [Remy's] thought processes." *Id.* at 12. There is no indication that Remy's attorney conducted further investigation into the PTSD diagnosis or the prison assault.

D. *The Trial and Sentencing*

Remy went to trial on charges of, among other crimes, assault in the first degree (for intentionally causing serious disfigurement, N.Y. Penal Law § 120.10 (2), and intentionally causing serious physical injury by means of a dangerous instrument, N.Y. Penal Law § 120.10(1)), aggravated assault upon a peace officer (for intentionally causing serious physical injury to a police officer by means of a dangerous instrument, N.Y. Penal Law § 120.11), and assault in the second degree (for causing physical injury to three different court officers with the intent to prevent them from performing a lawful duty, N.Y. Penal Law § 120.05(3)).

The defense theory at trial was that the prosecution could not prove the requisite mental state for the assault crimes because Remy had been surprised by the officers and generally did not understand why he was being put in jail, and that he had reacted violently only after one officer struck him with a baton. On direct examination, Remy testified that he did not hear or recall what the judge had said to him at the hearing. In response to the question, "What happened?" Remy testified that a court officer had patted his back while he was talking to his attorney, and the "next minute" the officers grabbed him, pulled on his sweater and bag, struck him with a baton, and "somehow everybody was jumping on" him. Tr. 396-98. Remy stated that he thought the court officer's ear had been severed by the edge of a table. *Id.* at 397. On cross-examination, the prosecution elicited from Remy testimony that he had not wanted to go to jail, and that he had gotten a flashback and had reacted out of "temporary insanity." *Id.* at 405-12. In his closing statement, Remy's attorney reminded the jury to pay attention to the elements of the crime, and argued that Remy could not be guilty if he lacked the requisite intent, including the intent to disfigure or injure the officer whom petitioner had bitten. Evidence of the prison assault was not offered by Remy at trial.

Remy was found guilty of all the assault counts, as well as of resisting arrest. At sentencing, the officer whose ear had been bitten stated that "at some level" he grieved for Remy because his life had been ruined by the incident, but said also that he remained upset that Remy had "spiteful[ly]" refused to submit to an HIV test after the courtroom incident and asked the court to consider that in sentencing. Sentencing H'g Tr. 4-8. The two other injured officers requested that Remy be given the maximum sentence, as did the prosecutor. Remy spoke as well, stating that it was possible he had bitten the injured officer but did not recall doing so. He

6

claimed that his counsel had been ineffective. Remy also mentioned the prison assault, claiming that he had been afraid of going to jail on account of the assault. Defense counsel did not mention the prison assault. The attorney conceded that the offense conduct was "obviously wrong," and suggested that though Remy's motivations were a "mystery" it might have been a combination of "stubbornness, arrogance, stupidity." *Id.* at 11. Counsel argued, however, that consecutive sentences were "overkill," that the 39-year consecutive-term sentence requested by the prosecutor was "over the top," and that a lesser punishment would suffice to "send a message that this should not be tolerated." *Id.* at 11-12.

The court sentenced Remy to 25 years of incarceration, the maximum possible term for the first-degree assault counts, imposing concurrent terms of 15 years for aggravated assault, seven years for the second-degree assault counts, and one year for various misdemeanor counts. Remy, who had complained repeatedly about not receiving paperwork throughout the trial, demanded copies of the paperwork in his case, reiterated his complaints about his attorney to the court, and had to be forcibly removed from the courtroom.

E.  *The Motion To Vacate and Direct Appeal*

On June 24, 2004, Remy filed a motion to vacate his conviction pursuant to New York Crim. Proc. Law § 440.10 ("the § 440 motion"), arguing that his trial attorney's failure to present evidence of the prison assault at trial and failure to raise mitigating facts at sentencing constituted ineffective assistance of counsel. In an affirmation provided by the prosecution, Remy's attorney stated three reasons for not pursuing a diminished capacity defense predicated upon the prison assault. First, he believed that Remy's statement about the assault was not truthful. The attorney noted that while Remy was incarcerated prior to the alleged assault, he

7

had made allegations about an incident that had later been disproved by videotape. Second, the attorney believed that a jury would not find a psychiatric defense plausible, given that the prospect of detention by a uniformed police officer was not analogous to a prison assault. Third, he stated that the defense would not work because Remy was a "difficult" client. Indeed, the record reflects that before trial Remy had refused to speak to his attorney about his defense or the possibility of a guilty plea. *See* Tr. 9, *Sandoval* H'g Tr. 13-15. Remy even refused to discuss whether to testify on his own behalf, so the attorney prepared a memorandum for him to read, advising him of the risks and advantages of testifying.

Remy claims that this affirmation is not credible and amounts to nothing more than a *post hoc* rationale for his attorney's ineffective assistance. In the § 440 motion, Remy's appellate counsel cited a conversation with the trial attorney in which the attorney claimed he could not remember speaking with Weidenbacher after receiving his letter, and that he had been unable to reach Kerner. The attorney claimed his "gut reaction" and "instinct" had been that a diminished capacity defense would not "go anywhere." Petition Ex. 2 (Lerner Aff.) ¶ 45.

The trial court denied the motion, holding that the trial attorney's "decision not to present a psychiatric defense was a prudent exercise in professional judgment, as were his actions at sentencing." *People v. Remy*, No. 3660/02, at 2 (N.Y. Sup. Ct. Aug. 26, 2004) (Katz, J.). Remy was granted leave to appeal from the denial of the motion, and that appeal was consolidated with Remy's direct appeal. On appeal, Remy argued there was insufficient evidence that he used a dangerous instrument, his trial attorney's performance was ineffective (advancing the same claims as he had argued in his § 440 motion), and his sentence was excessive. The Appellate Division, Second Department affirmed. Addressing the ineffective

8

assistance claim, the court held that Remy "failed to establish that there were no strategic or other legitimate explanations for counsel's decision not to pursue a diminished capacity defense, or that he was deprived of meaningful representation." *People v. Remy*, 798 N.Y.S.2d 478, 479 (2d Dep't 2005) (citations omitted). Leave to appeal to the New York Court of Appeals was denied. *People v. Remy*, 5 N.Y.3d 793 (2005).

Remy now challenges his conviction on the ground that he was denied his Sixth Amendment right to the effective assistance of counsel when his trial attorney (1) failed to properly investigate the possibility of a psychiatric defense and (2) failed to advance mitigating facts at sentencing.

## DISCUSSION

A. *The AEDPA Standard of Review*

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-123, 110 Stat. 1214 ("AEDPA"), federal courts are prohibited from granting habeas relief to an applicant "in custody pursuant to a judgment of a State court" for claims adjudicated by the state court on their merits, unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). A state court adjudicates the claim on the merits, for AEDPA purposes, whenever it does not

9

clearly and expressly rely on procedural grounds to dispose of a claim. *See Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006).

The state court adjudication is "contrary to" clearly established federal law, as determined by the Supreme Court, if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 519 U.S. 362, 413 (2000). The Second Circuit has decided that the standard for ineffective assistance applied by New York courts is not "contrary to" the federal standard. *See, e.g.*, *Eze v. Senkowski*, 321 F.3d 110, 122-24 (2d Cir. 2003). Accordingly, the question on review is whether the state court determination that Remy was not denied the effective assistance of counsel was an "unreasonable application" of clearly established Supreme Court law, that is, whether the state court "identifie[d] the correct legal principle . . . but unreasonably applie[d] that principle to the facts of [a] prisoner's case." *Williams*, 529 U.S. at 413.

Remy asks that I depart from *Eze* and other governing cases that hold that the New York standard for ineffective assistance of counsel is not "contrary to" the federal standard. In this regard, Remy notes that the Second Circuit has questioned the reasoning of those cases in *Henry v. Poole*, 409 F.3d 48, 70-71 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 1622 (2006). I decline to depart from controlling Second Circuit precedent, but even if I did, I would deny the petition because Remy's claims of ineffective assistance fail even under *de novo* review.

B.  *The Ineffectiveness Challenge*

Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a convicted defendant challenging the constitutional adequacy of his counsel's performance must show "counsel's

performance was deficient" and "the deficient performance prejudiced the defense." To determine whether performance was constitutionally deficient, the court must judge "whether, in light of all the circumstances, . . . identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. There is, however, "a strong presumption" that assistance of counsel "falls within" that "wide range." *United States v. Jones*, 918 F.2d 9, 11 (2d Cir. 1990). On the prejudice side, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The prejudice prong presents "the question . . . whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

1. <u>Trial Counsel's Conduct at Trial</u>

The assistance provided to Remy at trial was not constitutionally ineffective, even without AEDPA deference. Remy contests the trial attorney's decision not to investigate the prison assault beyond the competency reports of Weichenbacher and Kramer. He argues that the omission resulted not from "sound trial strategy," *Eze*, 321 F.3d at 112, but rather counsel's negligence. However, counsel had good reason to balk at basing a defense[2] upon the alleged prison assault. After all, such a defense would be vulnerable to impeachment and, according to his affirmation, counsel believed Remy was not telling the truth about the assault. Remy invites me to discredit this affirmation as self-serving rationalization, but even if I were inclined to do

---

[2] Under New York law, proof of a mental defect of diminished capacity or extreme emotional disturbance is an affirmative defense to specific intent crimes. N.Y. Crim. Proc. Law § 250.10(1)(c); *People v. Segal*, 54 N.Y.2d 58, 66 (1981) ("Proof of a mental defect other than insanity . . . may . . . negate a specific intent necessary to establish guilt."). New York courts have held that PTSD can be relevant to such a defense. *See People v. Harris*, 95 N.Y.2d 316, 319 (2000).

11

so, I would conclude that counsel's performance was not ineffective. At bottom, Remy simply disputes his attorney's decision to mount a sufficiency challenge rather than a psychiatric defense, but he provides no reason for me to conclude that counsel's decision was anything other than a reasonable strategic choice.[3] That trial counsel characterized the decision as one of "instinct," Petition Ex. 2 (Lerner Aff. ¶ 45), is scarcely a basis to second-guess his decision. Instinct is among a trial lawyer's most important assets.

Remy contends that with the fruits of a full investigation, defense counsel would have put on a strong defense of diminished capacity that would have changed the outcome of the trial. The ineffectiveness analysis, however, does not proceed from the 20-20 perspective of what might have occurred had a particular strategy been adopted. *See Strickland*, 466 U.S. at 689. Remy's speculation that a psychiatric defense might have worked does not defeat the presumption that counsel's choice not to investigate the prison assault beyond the psychiatric reports was professionally competent.

In addition, Remy fails to demonstrate with any reasonable degree of probability that a full investigation into a diminished capacity defense would have changed the outcome of his trial. Because the record contains no evidence of the prison assault apart from Remy's statements, and because the examinations of Weidenbacher and Kerner (and, it appears, Remy's initial mental health screening and follow-up evaluations) were based solely upon those statements, a jury would have had to accept the defense on Remy's word alone. Cross-examination would have given the jury plenty of reason to reject the defense. For example, it

---

[3] Remy argues that the severing of a court officer's earlobe is *per se* evidence of specific intent, and therefore a sufficiency challenge was bound to fail. I disagree. A jury might conclude, for example, that Remy's jaw had clenched on account of his being in pain, or being struck in the jaw, and that the injury had therefore been inflicted unintentionally.

12

would have revealed that Remy's story about the assault had changed while he was still at Riker's Island. And the prosecution would have impeached Remy with his history of reporting an incident in prison only to be contradicted by a videotape of the incident.

Furthermore, even if the jury accepted that the prison assault had occurred, it was not bound to link that assault to Remy's violent reaction to the prospect of remand at his 2002 probation violation proceeding. Had Remy opened the door by arguing such a link, the prosecution could have undermined the claim by cross-examining Remy about his conviction for criminal mischief (a misdemeanor) and his violations for second-degree harassment and disorderly conduct, which all predated the prison assault. These past acts would have been relevant to rebut the claim that Remy's violent reactions had been motivated by the prospect of another prison assault.[4] In sum, Remy has not shown a reasonable probability that presenting such vulnerable psychiatric evidence would have raised a reasonable doubt to a jury about whether he had formed the mental state required for the assault charges.

Finally, there was plenty of evidence from which a jury could conclude that Remy did not suffer from a diminished capacity. Where the evidence of a defendant's guilt is very strong, a finding of prejudice is particularly unlikely. *See, e.g.*, *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991). Remy's detailed recall of the events and his critiques of the technique of the guards, for example, militated against a finding that he had suffered from a diminished capacity. And the extreme violence and difficulty of Remy's final assault -- the severing of part of an officer's ear with his teeth -- could very well cause a jury to conclude that the act was necessarily done with specific intent and not the result of a mere temporary loss of control.

---

[4] Arguably, Weidenbacher's report further undermines the link between Remy's PTSD and his fear of prison because the report opines that the prison assault was only one contributor to the PTSD.

13

2. <u>Trial Counsel's Conduct at Sentencing</u>

Remy argues that the trial attorney's failure to present mitigating evidence during the sentencing phase also amounted to constitutionally ineffective assistance of counsel. The failure to investigate and present important mitigating evidence during sentencing can indeed amount to constitutional error. *See, e.g.*, *Williams*, 529 U.S. at 396-97; *Wiggins v. Smith*, 539 U.S. 510, 538 (2003). But where the defendant cannot show prejudice, the claim will fail.

Here, Remy cannot show that the presentation of evidence of his psychiatric history was reasonably likely to have changed the outcome of the sentence. First, such evidence would have been susceptible to the same vulnerabilities that are discussed above. Even were the evidence introduced, therefore, the judge was not bound to accept it. Second, defense counsel succeeded in reducing the sentences imposed to concurrent prison terms. Remy's argument is therefore that the introduction of the psychiatric evidence was reasonably likely to have caused the court to reduce the sentence *further*. I cannot accept such an argument in light of the extensive testimony by the victims advocating for the maximum sentence, the extreme nature of one of the guard's injuries, and Remy's refusal to submit to an HIV test even after he was convicted.

CONCLUSION

For the foregoing reasons, I deny Remy's petition for a writ of habeas corpus. Because Remy has not made a substantial showing that he was deprived of a constitutional right, no certificate of appealability shall issue.

So ordered.


John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       February 12, 2007